| | | |
|---|---|---|
| MARKEL AMERICAN INSURANCE COMPANY, | } } } | |
| *Plaintiff*, | } } | |
| v. | } } | No. _____ |
| MATTHEW KENNETH WILKES and GREENSVIEW WEALTH MANAGEMENT, LLC, | } } } } } | |
| *Defendants.* | | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Markel American Insurance Company, by and through undersigned counsel of record, pursuant to 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure, hereby files its Complaint for Declaratory Judgment against Defendants Matthew Wilkes and Greensview Wealth Management, LLC, and states as follows:

### PARTIES AND BACKGROUND INFORMATION

1. This matter is a declaratory judgment action brought to determine whether Plaintiff Markel American Insurance Company owes a duty to defend and/or indemnify two claims against its insureds, Defendants Matthew Kenneth Wilkes and Greensview Wealth Management, LLC. The underlying claims and arbitration proceedings arose out of financial advice provided to clients of Wilkes and premium-financed life insurance policies sold to clients.

2. Plaintiff Markel American Insurance Company ("Markel") is a foreign corporation incorporated under the laws of State of Virginia with its principal place of business in Glen

Allen, Virginia. It is the insurance company that issued the policy of insurance at issue in this declaratory judgment action.

3. Defendant Matthew Kenneth Wilkes ("Wilkes") is, upon information and belief, a resident of Columbia, Tennessee, and may be served with process at 6795 Leipers Creek Road, Columbia, Tennessee 38401-1444.

4. Defendant Greensview Wealth Management, LLC ("Greensview") is, upon information and belief, a now-inactive Tennessee limited liability company with its principal place of business in Franklin, Tennessee. It may be served with process through its registered agent, Cogency Global Inc., 992 Davidson Drive, Suite B, Nashville, Tennessee 37205-1051.

## JURISDICTION AND VENUE

5. This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 2201-2202 as Markel seeks a declaratory judgment and 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

7. Wilkes works as a financial advisor. He previously worked, upon information and belief, as a financial advisor at Wells Fargo Advisors, LLC ("Wells Fargo Advisors") d/b/a Wells Fargo Clearing Services, LLC ("Wells Fargo Clearing Services") ("Wells Fargo"), Raymond James Financial Services, Inc. ("Raymond James"), FSIC, and TrustFirst. All of these firms are members of the Financial Industry Regulatory Authority ("FINRA").

8. Upon information and belief, William and Edith Apostal are retirees who reside in Chicago, Illinois. Wilkes began providing financial planning and asset management to William and Edith in 2009 while working for Wells Fargo.

9. In 2014, upon information and belief, Wilkes advised William and Edith to purchase a premium-financed life insurance policy to be owned by an Irrevocable Life Insurance Trust ("ILIT") to manage and/or grow their assets.

10. Upon information and belief, Wilkes also approached William's brother, Peter Apostal, and his wife, Kathy, with the same financial planning recommendations. Peter and Kathy also, upon information and belief, reside in Chicago, Illinois.

11. Both Apostal couples, upon information and belief, followed Wilkes' advice and placed their assets in a 100% premium-financed life insurance policy held by an ILIT. They say that Wilkes misled them with his advice, purchased high-risk life insurance policies that went against standard investment procedures, exposed their assets, risked their financial security, and ultimately lost millions of dollars each in the process.

12. Throughout this time, Wilkes initially worked for Wells Fargo, then moved to Raymond James in St. Petersburg, Florida, in July 2015; then to FSIC in Chicago in June 2017; then to TrustFirst in Knoxville, Tennessee, in April 2019; and then to Greensview in January 2024 where he was President and CEO.

*The Markel Insurance Policy*

13. Markel issued an Investment Adviser Professional Liability Policy, policy # PL86039D, effective from January 7, 2024, to January 7, 2025 (the "Policy"). The Named Insured was Greensview. A true and correct copy of this Policy is attached to this Complaint and incorporated as if set forth herein verbatim as **Exhibit A**.

14. The Policy contains an Investment Adviser Professional Liability Coverage Part with a Limit of Liability of $2,000,000 for each loss, a $25,000 retention, and an Aggregate Limit of

Liability of $2,000,000. It does not provide Professional Liability Insurance or Directions and Officers Liability Insurance. (*See* Ex. A.)

15. The Investment Adviser, Professional Services And Directors And Officers Liability Policy form (MPL 0002 05 19) contains the following coverage terms and conditions:

**SECTION I – COVERAGE**

**A. Insuring Agreements**

The Insurer, relying on the statements in the **application**, agrees with the Named Entity as follows:

Coverage is provided under the following Insuring Agreement(s) only if a Limit Of Liability for such Insuring Agreement(s) is shown in the Declarations.

**1. Investment Adviser Professional Liability Insurance**

The Insurer will pay, on behalf of an **insured adviser** or its **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

(Ex. A (emphasis in original).)

16. Section II of the form contains the following definitions:

**SECTION II – DEFINITIONS**

\* \* \*

**E. Claim** means:

**1.** Any demand for monetary damages in a legal action, mediation, arbitration or injunctive relief;

\* \* \*

**5.** Any administrative or regulatory proceeding commenced by the filing of a notice of charges, service or filing of a complaint, receipt of a Wells Notice or receipt or filing of any other pleading or document similar or comparable to the foregoing;

\* \* \*

made upon an **insured** for a **wrongful act**.

\* \* \*

G. **Defense cost(s)** means reasonable and necessary fees, costs, charges, and expenses incurred in the investigation, defense or appeal of any **claim** and the costs of appeal, attachment or similar bonds (but does not include applying for or furnishing such bond).

   **Defense costs** do not include fees, salaries, regular or overtime wages, overhead, benefits or extradition expenses.

\* \* \*

M. **Financial planning services** means financial or investment advice given to individuals or their owned business organizations as part of a written financial plan, comprehensive or modular, including advice with respect to personal risk management, investments, estate planning, retirement planning, college planning and taxes.

\* \* \*

P. **Insured(s)** means the Named Entity, **insured entity(ies)** and the **insured person(s)**.

Q. **Insured adviser(s)** means the Named Entity that is a registered "investment adviser" as defined in the Investment Advisers Act of 1940, and its amendments, and which renders **investment advisory services** to others.

R. **Insured entity(ies)** means the **accounting firm(s)**, **insured adviser(s)**, **life and health insurance agency(ies)** or **professional service provider(s)**.

S. **Insured executive(s)** means any person who has been, now is or becomes a duly elected or appointed partner, director, officer, chief compliance officer, managing member, manager or trustee of an **insured entity**.

T. **Insured person(s)** means:

   1. The **insured executives**;

   2. The chief compliance officer;

   3. Any person who has been, now is or will become an employee of an **insured entity**, but solely while providing **accounting services**, **investment advisory services**, **life and health services** or **professional services** on behalf of such **insured entity**;

---

**4.** The estates, heirs, or legal representatives of any person described in Paragraphs **1.** and **2.** above in the event of their death, incompetency, insolvency or bankruptcy; or

**5.** The lawful **spouse** of any person described in Paragraphs **1.** through **3.** above, but solely with respect to a **claim** arising solely out of his or her status as the **spouse** of such person; provided, however, an **insured person** does not include a lawful **spouse** with respect to a **claim** against such person for his or her own **wrongful acts**.

**Insured person** does not include independent contractors unless specifically endorsed by name to this Policy.

\* \* \*

**V.** **Investment advisory services** means **financial planning services**, or financial, economic or investment advice regarding investments or investment management services performed or required to be performed by an **insured adviser** for or on behalf of a customer pursuant to a written agreement between such customer and the **insured adviser** for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **insured adviser**. In addition, **investment advisory services** includes service performed:

**1.** As a fiduciary adviser as defined under Section 601 of the Pension Protection Act of 2006;

**2.** As a functional fiduciary commonly defined or described in Section 3(21) of **ERISA** when performing a covered service and solely arising out of rendering investment advice for a fee or other compensation;

**3.** As a fiduciary as an investment manager defined or described in Section 3(38) of **ERISA** when performing a covered service;

**4.** Or related **securities** or insurance purchases or sales by an **insured** within the normal scope of retirement or benefit planning services performed by an **insured adviser**.

\* \* \*

**Z.** **Loss** means the amount that an **insured** becomes legally obligated to pay on account of any **claim**, including but not limited to, damages (including punitive, exemplary, or multiplied damages, unless uninsurable under the law of the jurisdiction most favoring coverage for such damages), judgments, settlements, pre-judgment and post-judgment interest and **defense costs**.

**Loss** does not include:

1. Any costs incurred by an **insured** to comply with any order for injunctive or other non-monetary relief, any agreement to provide such relief or any regulatory or administrative directive;

2. Taxes imposed on an **insured**, fines or penalties, except as provided above with respect to punitive, exemplary, or multiplied damages;

3. Any amount not insurable under the law pursuant to which this Policy is construed, except as provided above with respect to punitive, exemplary or multiplied damages;

4. Regular or overtime wages, salaries, commissions, or fees of **insured persons**; or

5. Any fees, charges, commissions or other compensation paid to an **insured**, including allegedly excessive or improper fees.

\* \* \*

FF. **Professional service(s)** means services rendered for or advice given to others by an **insured** for a fee, remuneration, **pro bono** or other consideration in an **insured's** business and explicitly listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy.

\* \* \*

PP. **Wrongful act** means:

1. With respect to Insuring Agreement **1.** Investment Adviser Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured adviser** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **investment advisory services**;

2. With respect to Insuring Agreement **2.** Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any:

\* \* \*

c. **Professional service provider** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **professional services**;

\* \* \*

(*Id*.)

17. Section III of the form contains the following exclusions:

**SECTION III – EXCLUSIONS**

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

**A.** Any:

**1.** **Insured** gaining any profit, remuneration or pecuniary advantage to which they were not legally entitled, including but not limited to, any remuneration to an **insured** not properly approved by any shareholders; or

**2.** Deliberately fraudulent, dishonest or criminal actions of an **insured**;

provided, however, that any of the above is established by admission of an **insured** in writing or a final, nonappealable adjudication in the underlying action.

For the purpose of determining the applicability of this exclusion, knowledge possessed by any **insured person** will not be imputed to any other **insured person**, but knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer, comptroller or general counsel (or equivalent position) of the Named Entity or an **insured entity** will be imputed to any **insured entity**.

**B.** Any **wrongful act** or any matter, fact, circumstance, situation, transaction, cause or event and **interrelated wrongful act** which has been the subject of any notice given under any prior policy of which this Policy is a renewal or replacement or which it may succeed in time.

**C.** Any demand, suit, proceeding, investigation or **claim** pending as of or made against any **insured** prior to the Pending And Prior Proceeding Date shown in the Declarations; or

Any wrongful act or matter, fact, circumstance, situation, transaction, cause or event and interrelated wrongful act, regardless of the legal theory upon which demand, suit, proceeding, investigation or claim made against any insured prior to the Pending And Prior Proceeding Date shown in the Declarations is predicated.

\* \* \*

**I.** Breach of contract; provided, however, this exclusion does not apply to any **claim** for rendering or failing to render **investment advisory services**, **accounting services**, **life and health services** or **professional services**.

**J.** Any:

**1.** Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

**2.** Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities**; or **3.** Investment banking, leveraged buyouts, going private transactions, fairness opinions, mergers, acquisitions, restructurings, divestitures, **securities** offerings, syndications, underwriting or similar activities.

\* \* \*

**R.** Any **claim** involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an **insured** for **accounting services**, **investment advisory services**, **life and health services** or **professional services** rendered by an **insured**; provided, however, that this exclusion will not apply to **defense costs**.

\* \* \*

(*Id*.)

18. Section IV of the form contains the following limits of liability and retentions:

**SECTION IV – LIMITS OF LIABILITY AND RETENTIONS**

**A. Limits Of Liability**

**1. Aggregate Limit Of Liability**

The Aggregate Limit Of Liability shown in the Declarations is the Insurer's aggregate liability for all **loss**, in excess of the applicable Retention, under all Coverages combined for all **claims** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable, and reported in writing to the Insurer pursuant to Section **VI** – Notice.

**2. Insuring Agreement Limit Of Liability**

Subject to the Aggregate Limit Of Liability, the applicable Insuring Agreement Limit Of Liability shown in the Declarations is the Insurer's maximum liability for all **loss** under each insuring agreement, in excess of the applicable Retention, for each **claim** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable, and reported in writing to the Insurer pursuant to Section **VI** – Notice.

### 3. Interrelated Wrongful Acts

All **claims** for the same **wrongful act** or **interrelated wrongful acts** will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section **VI** – Notice, whichever is earliest, whether before or during the Policy Period.

**Defense costs** are part of, not in addition to, the applicable Limit Of Liability. Such **defense costs** will reduce the applicable Limit Of Liability and will be applied against the Retention. The Insurer will have no obligation to pay any **loss** or to defend or continue to defend any **claim** or to pay **defense costs** after the applicable Limits Of Liability have been exhausted by payment of **loss** or **defense costs**.

(*Id*.)

19. The Policy is modified by a Commissionable Sales Coverage – Named Individuals form (MPL 1219 05 19), which contains the following provisions:

**SCHEDULE**

| Named Individuals | Retroactive Date | Termination Date |
|---|---|---|
| Matthew K. Wilkes | 09/01/2018 | |

**A.** The following is added to exclusion **J.2.** under Section **III** – Exclusions:

This exclusion, **J.2.**, does not apply to the Named Individuals shown in the Schedule of this endorsement solely with respect to **wrongful acts** in the rendering of or failure to render services prior to and during their affiliation with the Named Entity as a **registered representative**, **life insurance agent**, or registered "investment adviser" provided:

**1.** A Retroactive Date is shown in the Schedule of this endorsement; and

**2.** The **wrongful act** occurred on or after the applicable Retroactive Date and prior to the applicable Termination Date, if any, shown in the Schedule of this endorsement.

**B.** This endorsement will not increase the Limits Of Liability shown in the Declarations.

(*Id.*)

20. The Policy is further modified by an Exclusion – Prior Knowledge form (MPL 1313 05 19), which contains the following provisions:

**SCHEDULE**

| Insuring Agreement(s) | Date |
|---|---|
| Investment Adviser Professional Policy | 12/08/2020 |

The following is added to Section **III** – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **wrongful act** or **interrelated wrongful acts** related to the Insuring Agreement(s) shown in the Schedule of this endorsement and occurring prior to the applicable Date shown in the Schedule of this endorsement which any **insured** knew or could reasonably have foreseen that such **wrongful act** or **interrelated wrongful acts** could lead to a **claim** under this Policy.

For the purpose of this exclusion, all actual or alleged **interrelated wrongful acts** will be deemed to have taken place on the date on which the earliest of such actual or alleged **wrongful acts** took place.

(*Id.*)

21. The Policy is further modified by an Exclusion – Reimbursement of Fees form (MPL 1315 07 17), which contains the following provisions:

The following is added to Section **III** – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **claim** Involving the amount, return, disgorgement or reimbursement of fees, commissions or other sums paid to an **insured** for **professional services** rendered by an **insured**.

(*Id.*)

22. The Policy is further modified by an Exclusion – Specified Person, Organization, Investment Vehicle, Service or Activity form (MPL 1323 05 19), which contains the following provisions:

| Specified Person(s), Organization(s), Investment Vehicle(s), Service(s) Or Activity(ies) |
| --- |
| See attached schedule |

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

**SCHEDULE**

\* \* \*

Providing or arranging for the provision of premium financing for life insurance products; however, this does not include referring clients without receiving commission to an unaffiliated premium finance company.

(*Id*.)

*The Underlying Arbitration Statements of Claim*

23. On December 21, 2023, William and Edith Apostal initiated an arbitration proceeding against Wilkes and his former employers with the FINRA Dispute Resolution Services, Arbitration # 23-03617. A copy of their Statement of Claim is attached and incorporated into this Complaint as **Exhibit B**.

24. This Statement of Claim, in part, alleged as follows:

William and Edith Apostal are retirees who entrusted their overall financial planning and asset management to their financial advisor Matthew Wilkes. Having advised the Apostals for five years, Wilkes came to the Apostals in 2014 with a scheme to that he described as "free money" for the Apostals' heirs. The Apostals trusted Wilkes and reasoned that based on their past relationship with him and because he was employed by Wells Fargo, Wilkes' plan was a shrewd

and sound investment strategy. Wilkes advised the Apostals to invest their assets in a premium- financed life insurance policy to be owned by an Irrevocable Life Insurance Trust ("ILIT"). The loan would be personally guaranteed, so as the Apostals later came to learn, the whole structure exposed all the Apostals' assets and put their financial security at risk.

Wilkes did not properly explain the risks that are inherent to such an investment strategy. Then, five years after the initial insurance policy purchase, Wilkes made the grossly unsuitable recommendation that the Apostals change insurance providers. In doing so, Wilkes made an extremely large commission and put the Apostals' financial plan at further risk. Wilkes breached his fiduciary duty to the Apostals, as well as his duty to make only suitable recommendations, by making this recommendation, while his employers failed to supervise Wilkes and similarly breached their fiduciary duty to the Apostals. Both Wilkes and his employers also breached contract law in making these unsuitable recommendations.

Wilkes and his employers exposed all of the Apostals' assets to a risky 100% premium-financed policy held by an ILIT. Then to make matters worse, they guided the Apostals into a grossly unsuitable new life insurance policy in 2020. . . .

* * *

10. Wilkes had been a trusted financial advisor for the Apostals for five years when he came to them in 2014 and recommended a plan to obtain what he described as "free money" for the Apostals' heirs. Wilkes told the Apostals that their substantial real estate holdings could be called-in by the lenders upon either Edith or William's death, and their heirs would be in jeopardy of losing the properties. Wilkes recommended the Apostals utilize a 100% premium-financed policy held by an ILIT. The Apostals were unfamiliar with this investment strategy, but trusted Wilkes and the expertise and resources he had available through his employer, who at the time was Wells Fargo. There is no evidence that Wilkes properly explained the risks specific to premium financing. In fact, Wilkes' false and deceptive representation was the sole reason the Apostals purchased the Voya policy in 2015.

11. Following Wilkes's misleading advice, the Apostals applied for life insurance on the life of Edith Apostal. They applied for policies through several insurance companies, including Security Life of Denver Insurance Company, also known as Voya ("Voya"). Wilkes hid numerous problems inherent to this scheme. At the time, Edith Apostal was 72 years old, a relatively advanced age for the creation of a premium-financed life insurance policy. Wilkes recommended the Apostals purchase a life insurance policy instead of a second-to-die policy, which would have been the standard recommended policy in this investment structure. A second-to-die policy would have had a lower premium, with a corresponding lower commission

for Wilkes. Most significantly, Wilkes never explained that the Apostals would need to supply additional collateral if the policy cash surrender value did not keep pace with the loan.

12. The Apostals settled on a policy issued through Voya, however the illustrations of this policy that were provided to them did not make clear its risks. The Edith M. Apostal Irrevocable Trust was created on June 1, 2015, with William Apostal signing as Trustee. The ILIT would own the Voya policy, which had an annual premium of $715,000. The Voya policy was 100% premium financed through a loan from First Insurance Funding Corp. or Wintrust ("Wintrust"). Wintrust required additional collateral every year, and investment accounts were pledged.

\* \* \*

17. In late 2019, Wilkes reached out to the Apostals to recommend that they find a new life insurance policy because Voya was getting out of the index variable life insurance business. He told then that Voya was "getting out of the business" and their plan would collapse unless they moved to another insurance company. Edith Apostal was 77 years old at this point, but the Apostals trusted Wilkes and began the onerous process of applying for a new life insurance policy. In reality, there was no reason for the Apostals to leave Voya. Voya was purchased by another insurance company and all its policies remained valid. By scaring the Apostals into purchasing a new life insurance policy, Wilkes may well have earned a combined amount of more than $1 million in commissions.

\* \* \*

18. In November and December of 2019, the Apostals completed medical forms for Pacific Life. They had numerous questions for Wilkes, who dismissed their concerns. On one information form from Pacific Life, the Apostals handwrote out a list of questions, ranging from "is the Voya policy canceled now?" and "are the Voya $s transferred to PL" to "is Wintrust still covering the monthly premium?" The scope of these questions points to the Apostals' limited understanding of the complicated structure of the premium financed ILIT, and Wilkes' failure to explain the nature of the investment and its accompanying risks.

19. On March 11, 2020, Pacific Life sent a letter to the Apostals denying life insurance coverage for Edith Apostal due to her age. Meanwhile, on the same day, Wintrust sent a letter to the Apostals informing them that the Raymond James brokerage account that was secured as collateral had declined in value. The loan went into default.

20. On March 20, 2020, Wintrust sent another letter to the Apostals saying they had insufficient collateral to fully secure the note and an event of default had

occurred. . . .

\* \* \*

22. In May 2020 the Apostals completed yet another application for life insurance through Pacific Life.
23. On October 1, 2020, the Edith Apostal Irrevocable Trust assigned a Pacific Life insurance policy and William Apostal's securities account to Wintrust by a Third Amendment to Master Promissory Note.
24. On February 2, 2021, Wilkes took the highly alarming step of drafting a letter, to be signed by William Apostal, purporting to acknowledge the risks associated with taking out a new policy from Pacific Life and indemnifying Pacific Life from any future legal actions. The letter states that the purpose of the policy and ILIT is to cover the Apostals' current debt exposure in the event of their demise, with a secondary goal of covering any estate tax liability. In fact, the Apostals have no federally taxable estate and will have only a small amount of Illinois state tax liability. The letter refers to "new extra income" that the Apostals will have access to that will help them pay Pacific Life for the new policy.

\* \* \*

26. A Pacific Life insurance policy was issued on April 26, 2021, and assigned to Wintrust.

\* \* \*

29. In June 2023, the Wintrust loan equaled the collateral, including the cash value of the life insurance plus the Bill Apostal Trust TD Ameritrade account. The Apostals would have needed to add additional collateral even if additional interest payments were not added to the principal of the loan.
30. The Wintrust loan would mature in September 2025. If Wintrust did not renew this loan, the Apostals could owe more than $6.1 million at that time.

\* \* \*

32. The Apostals decided to sell the Pacific Life policy and used the cash surrender value along with the collateralized account to pay off Wintrust. After Wintrust was repaid, the Apostals netted only $151,429 from the policy sale.

(Ex. B.)

25. The Statement of Claim for William and Edith Apostal asserts causes of action against

Wilkes for Unsuitable Recommendations in violation of FINRA Rule 2111, Breach of Fiduciary

Duty, and Breach of Contract (Express Breach and Breach of the Covenant of Good Faith and Fair Dealing). (*Id.*)

26. William and Edith Apostal assert the risky investments Wilkes directed them into cost them at least $4,171,885.12, and they seek compensatory damages in that amount along with "pre-judgment interest, attorneys' fees and costs, filing and forum fees, and such other and further relief which this Panel deems just and proper under the circumstances." (*Id.*)

27. Shortly thereafter, in early 2024, Peter and Kathy Apostal initiated their own arbitration proceeding against Wilkes and his former employers with the FINRA Dispute Resolution Services, Arbitration # 24-00307. A copy of their Statement of Claim is attached and incorporated into this Complaint as **Exhibit C**.

28. This Statement of Claim, in part, alleged as follows:

> Peter and Kathy Apostal are retirees who entrusted their overall financial planning and asset management to their financial advisor Matthew Wilkes. Having advised Peter Apostal's brother for years, Wilkes came to Peter and Kathy Apostal in 2014 with a scheme to that he described as "free money" for the Apostals' heirs. The Apostals trusted Wilkes and reasoned that based on their extended family's relationship with him and because he was employed by Wells Fargo, Wilkes' plan was a shrewd and sound investment strategy. Wilkes advised the Apostals to invest their assets in a premium-financed life insurance policy to be owned by an Irrevocable Life Insurance Trust ("ILIT"). The loan would be personally guaranteed, so as the Apostals later came to learn. The whole structure exposed all the Apostals' assets and put their financial security at risk. Wilkes did not properly explain the risks that are inherent to such an investment strategy.
>
> Then. five years after the initial insurance policy purchase, Wilkes made the grossly unsuitable recommendation that the Apostals change insurance providers. In doing so, Wilkes made an extremely large commission and put the Apostals' financial plan at greater risk. Wilkes breached his fiduciary duty to the Apostals, as well as his duty to make only suitable recommendations, by making this recommendation, while his employers failed to supervise Wilkes and similarly breached their fiduciary duty to the Apostals. Both Wilkes and his employers also breached contract law in making these unsuitable recommendations.
>
> Wilkes and his employers exposed all of the Apostals' assets to a risky 100% premium-financed policy held by an ILIT. Then to make matters worse, they

guided the Apostals into a grossly unsuitable new life insurance policy in 2020 . . . .

* * *

10. Wilkes had been a trusted financial advisor for Peter Apostal's brother, William Apostal, for five years when William introduced Wilkes to Peter and Kathy in 2014. Wilkes had approached William with a plan to obtain what he described as "free money" for their heirs. Wilkes also recommended this plan to Peter and Kathy, telling them that their substantial real estate holdings could be called-in by lenders upon either Peter or Kathy's death, and their heirs would be in jeopardy of losing the properties. Peter and Kathy would create an ILIT that would hold a 100% premium-financed Voya life insurance product purchased with a loan from the bank. He did not explain that Peter and Kathy would need to provide collateral to back up the loan from the bank or that this plan came with considerable risks. The Apostals were unfamiliar with this investment strategy, but they trusted Wilkes. They also reasoned that Wilkes was employed by a reputable bank with extensive expertise and resources, which at the time was Wells Fargo. There is no evidence that Wilkes properly explained the risks specific to premium financing. In fact, Wilkes's false and deceptive representation was the sole reason the Apostals purchased the Voya policy.

11. Following Wilkes's misleading advice. the Apostals applied for life insurance on the life of Kathy Apostal. On May 27, 2015, Kathy Apostal completed a Life Insurance Financing Credit Application through First Insurance Funding Corp. Wilkes hid numerous problems inherent in this scheme. At the time, Kathy Apostal was 67 years old, a relatively advanced age for the creation of a premium-financed life insurance policy. Wilkes recommended the Apostals purchase a life insurance policy instead of a second-to-die policy, which would have been the standard recommended policy in this investment structure. A second-to-die policy would have had a lower premium, with a corresponding lower commission for Wilkes. Most significantly, Wilkes never explained that the Apostals would need to supply additional collateral if the policy cash surrender value did not keep pace with the loan.

* * *

13. The Apostals settled on a policy issued through Security Life of Denver Insurance Company, also known as Voya ("Yoya"). However, the illustrations of this policy that were provided to them did not make clear its risks. The Kathy B. Apostal Irrevocable Trust was created on November 9, 2015, with Peter Apostal signing as Trustee. The ILIT would own the Yoya policy, which was 100% premium-financed through a loan from First Insurance Funding Corp. or Wintrust ("Wintrust").

14. On December 4, 2015, Peter Apostal, acting in his role as Trustee of the Kathy B. Apostal Irrevocable Trust, in reliance on Wilkes' recommendation, signed an Assignment of Life Insurance Policy as Collateral, assigning the policy to Wintrust. Voya added the assignment to the policy on December 10, 2015.

* * *

16. On May 21, 2019, Peter and Kathy Apostal signed a letter as customers, consenting to a request from Wintrust Finance to TD Ameritrade transferring $900,000 and shares of securities.

17. In late 2019, Wilkes reached out to the Apostals to recommend that they find a new life insurance policy because Voya was getting out of the index variable life insurance business. He told them that Voya was "getting out of the business" and their plan would collapse unless they moved to another insurance company. Kathy Apostal was 72 years old at this point, but the Apostals trusted Wilkes and began the onerous process of applying for a new life insurance policy. In reality, there was no reason for the Apostals to leave Voya. Voya was purchased by another insurance company and all its policies remained valid. By scaring the Apostals into purchasing a new life insurance policy, Wilkes may well have earned a combined amount of more than SI million in commissions.

18. The Apostals had numerous questions for Wilkes, who dismissed their concerns. The Apostals has a limited understanding of the complicated financial structure of the premium financed ILIT, and Wilkes failed to explain the nature of the investment and its accompanying risks.

* * *

20. Pacific Life issued a life insurance policy for Kathy Apostal on March 25, 2020. The policy was assigned to Wintrust.

* * *

22. In June or July of 2020, the Apostals sent a letter to Voya saying they were concerned about Wilkes's advice and asked for a detailed expense report of the Voya policy. This letter was prepared by Marc Jacobsen and reflects his unease with Wilkes's recommendation that the Apostals switch from Voya to Pacific Life.

* * *

24. Wilkes was upset by this letter and spoke with the Apostals. He explained that his plan was solid, and because Voya no longer sold these types of policies, the Apostals would be better served moving their life insurance policy to Pacific Life. Because the Apostals had now worked with Wilkes as

a financial advisor for many years, and had been referred to Wilkes by Peter's brother, they believed his assurances.

\* \* \*

26. On September 22, 2020. Barry Flagg ("Flagg") of Veralytic prepared a report comparing the Voya and Pacific Life policies. His findings noted that the costs charged in the Pacific Life policy were more than double the costs that would have been charged in the Voya policy. For example, "costs over the 17 years shown in the (Pacific Life) illustration total $7,835,412 which is $4,045,717 more than the $3,789,695 that would have been charged over the next 17 years per the Voya illustration."

27. In addition to the costs, the risks of additional "premium calls" or policy lapse in the Pacific Life policy arc also significantly greater than that of the Voya policy. In other words, "the rate of return required in the (Pacific Life) policy to meet illustrated expectations is 11.76% whereas the rate of return required in the Voya policy to meet illustrated expectations is 7.85%." Finally. Flagg found that the benefits in the Pacific Life policy are also significantly less than what would have been provided by the Voya policy.

\* \* \*

33. By late June 2023, the Wintrust loan had an approximate balance of $5,142,97l with a current interest rate of 6.7%. The Cash Surrender Value of the Pacific Life policy was $3.202,905, with a historical annual rate of 6.28%. The Death Benefit was $11,429,030. Assuming no additional premium payments, an average annual return of 6.28%, and keeping the Death Benefit as is, the policy would likely lapse around age 88 and there would be no death benefit to pay off the loan to Wintrust beyond this point.

34. The Apostals had to make a difficult decision. In July 2023, they decided to use the pledged Ameritrade accounts worth $2,114,982.14 to pay down the Wintrust loan. They surrendered the Pacific Life policy on July 19, 2023, and received $3,171,985.35 which the Apostals used to pay off the remainder of the Wintrust loan. This left the Apostals with $31.384.88. Upon Wintrust's final calculation of all credits and debits the Apostals were left with $101.357.15. The Apostals paid $44,252.00 in excess fees and have an estimated foregone investment return of $520,986.00.

(Ex. C.)

29. The Statement of Claim of Peter and Kathy Apostal asserts causes of action against Wilkes for Unsuitable Recommendations in violation of FINRA Rule 2111, Breach of Fiduciary

Duty, and Breach of Contract (Express Breach and Breach of the Covenant of Good Faith and Fair Dealing). (*Id.*)

30.  Peter and Kathy Apostal assert the risky investments Wilkes directed them into cost them at least $2,680,220.14, and they seek compensatory damages in that amount along with "pre-judgment interest, attorneys' fees and costs, filing and forum fees, and such other and further relief which this Panel deems just and proper under the circumstances." (*Id.*)

31.  Wilkes notified Markel of the Apostals' arbitration claims and demanded that Markel defend and/or indemnify him with respect to the underlying arbitration proceedings.

32.  Markel provided a defense to Wilkes subject to a full reservation of rights. Markel specifically reserved its right to assert that the terms, conditions, exclusions, and endorsements in the Policy did not require Markel to defend or indemnify Wilkes and/or Greensview in the underlying arbitration proceedings brought by the Apostals. A copy of this May 8, 2025 Reservation of Rights letter is attached and incorporated as if set forth herein verbatim as **Exhibit D**.

**COUNT ONE**
**DECLARATORY JUDGMENT**

33.  Markel hereby adopts and incorporates by reference all prior paragraphs set forth in this Complaint as though set forth fully herein.

34.  Based upon the foregoing, including all enclosed terms and conditions of the Policy, the rights and duties of Markel with respect to Defendants have been called into question, and an actual controversy exists on whether the underlying lawsuit requires Markel to provide insurance coverage for the claims asserted in the form of a defense to the underlying lawsuit and/or indemnification for any claims potentially covered, in whole or in part, under the Policy.

35. Based on the allegations raised in the tendered claim and the terms and conditions of the Policy, there exists a *bona fide* controversy between the parties with respect to the obligation of Markel to afford coverage for the aforementioned claims and losses.

36. Markel asserts that some, if not all, of the claims made by the Apostals against Wilkes fall outside of the scope of coverage afforded by the terms, conditions, exclusions, definitions and endorsements in the Policy which would foreclose any further obligation or duty on the part of Markel to defend and/or indemnify Wilkes in the arbitration claims brought by the Apostals, including, but not limited to, the Exclusion – Specified Person, Organization, Investment Vehicle, Service or Activity form (MPL 1323 05 19) within the Policy.

37. Markel seeks a declaration and judgment that it does not owe Defendants an obligation to a duty to defend and/or indemnify for all or certain causes of action raised in the underlying complaint of the Apostals for the following reasons as some, if not all, of the claims made by the Apostals against Wilkes and Greensview fall outside of the scope of coverage afforded by the terms, conditions, exclusions, definitions and endorsements in the Policy which would foreclose any further obligation or duty on the part of Markel to defend and/or indemnify Wilkes and/or Greensview in the arbitration proceedings brought by the Apostals. These include: 1) the Exclusion – Specified Person, Organization, Investment Vehicle, Service or Activity form (MPL 1323 05 19), 2) the Exclusion – Prior Knowledge form (MPL 1313 05 19), and/or 3) Commissionable Sales Coverage – Named Individuals form (MPL 1219 05 19).

38. In addition, Markel seeks reimbursement of costs, expenses, and attorney's fees with respect to bringing this cause of action.

**WHEREFORE, premises considered,** Markel prays for the following relief:

1. That proper process issue to Defendants requiring an Answer to this Complaint for Declaratory Judgment within the time allowed by law;

2. That this Court grant Markel a judgment pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 against Defendants and declare that the Policy does not cover the allegations and causes of action in the underlying arbitrations proceedings, thereby relieving Markel of a duty to defend and/or indemnify Wilkes and/or Greensview with regard to the underlying cause of action;

4. An award of Markel's costs, fees, expenses, and/or disbursements incurred in prosecuting this action;

5. Pre-judgment and post-judgment interest; and

6. Any further relief, in law or equity, to which Markel may be entitled as determined by this Court pursuant to 28 U.S.C. § 2202.

Respectfully submitted,

LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC

By:    Jeffrey E. Nicoson, No. 027445*
    *admission pending*
    Brinkley Plaza, Suite 800
    80 Monroe Avenue
    Memphis, Tennessee 38103
    Phone: (901) 527-0214
    Fax: (901) 527-8224
    jeff.nicoson@leitnerfirm.com


*/s/ Anthony M. Noel*
Anthony M. Noel, No. 018828
Laura E. Bassett, No. 035936
750 Old Hickory Boulevard
Building One, Suite 200
Brentwood, Tennessee 37027
Phone: (615) 255-7722
Fax: (615) 780-2210
tony.noel@leitnerfirm.com
laura.bassett@leitnerfirm.com

*Counsel for Plaintiff Markel
American Insurance Company*